T.C. Memo. 2021-118

UNITED STATES TAX COURT

TARYN L. DODD, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7316-17L.                                      Filed October 5, 2021.

Taryn L. Dodd, pro se.

<u>Jacob Russin</u>, <u>Rachel L. Rollins</u>, and <u>Jeffrey E. Gold</u>, for respondent.

MEMORANDUM OPINION

LAUBER, <u>Judge</u>:  In this collection due process (CDP) case petitioner seeks review of a determination by the Internal Revenue Service (IRS or respondent) to uphold collection action.  For 2013 petitioner failed to pay $169,882 of the tax reported on her return, and the IRS sustained a seizure of her State tax refund in an effort to collect part of this tax.  The case has been remanded twice for supplemen-

**[\*2]** tal hearings in the IRS Independent Office of Appeals (Appeals Office).  See

Dodd v. Commissioner (Dodd I), T.C. Memo. 2019-107, 118 T.C.M. (CCH) 186.

The parties have now submitted the case for decision without trial under Rule 122.[1]

Concluding that petitioner is liable for the unpaid tax and finding no abuse of

discretion in any respect, we rule in favor of respondent.

Background

These facts are derived from the parties' pleadings, a stipulation of facts, and

the exhibits attached thereto.  The stipulation of facts includes the administrative

record from the original CDP hearing and additional documents introduced into the

record during the second supplemental CDP hearing.  Petitioner resided in Virginia

when she filed her petition.

During 2013 petitioner was employed as the office manager of Braude &

Margulies, P.C. (B&M), a law firm in Washington, D.C.  Herman Braude was a

founding member of B&M.  The firm specialized in real estate and construction

law.

During 2013, and continuing at least until 2020, petitioner was a member of

Cadillac Investment Partners, LLC (Cadillac), which engaged in the purchase,

---

[1]All statutory references are to the Internal Revenue Code in effect at all
relevant times, and all Rule references are to the Tax Court Rules of Practice and
Procedure.  We round all monetary amounts to the nearest dollar.

[*3] leasing, and sale of real property. Petitioner was the managing member of Cadillac and held a 33.5% share of its profit, loss, and capital account. As managing member petitioner regularly signed agreements, tax returns, and other documents on Cadillac's behalf. Mr. Braude held the remaining 66.5% interest in Cadillac's profit, loss, and capital account. The real estate assets owned by Cadillac included the building at 1200 Potomac Street, N.W., in which B&M's office was located.

During 2013 Cadillac sold commercial real property for $4 million, generating a net section 1231 gain of $3,203,916. Cadillac reported this gain on a Form 1065, U.S. Return of Partnership Income, which petitioner signed as Cadillac's managing member. Cadillac also reported ordinary business income of $5,700, a net rental real estate loss of $300,717, and distributions to partners of $614,882.

Cadillac included with its return, and issued to petitioner, a Schedule K-1, Partner's Share of Income, Deductions, Credits, etc. This schedule showed petitioner as holding a 33.5% share of the partnership's profit, loss, and capital. It listed her distributive shares of the partnership's items of income as follows:

| Item | Petitioner's share |
|---|---|
| Net section 1231 gain | $1,073,312 |
| Ordinary business income | 1,909 |
| Net rental real estate income | (100,739) |
| Distributions | 201,601 |

[*4] For 2013 petitioner timely filed a return on Form 1040, U.S. Individual Income Tax Return. This return was prepared by the same certified public accountant that prepared Cadillac's return. Petitioner reported wages of $116,479 from B&M and the items of income and loss that Cadillac had reported to her on the Schedule K-1. She included with her return Form 4797, Sales of Business Property, reporting net section 1231 gain of $1,073,312. She reported a tax liability of $183,976, withholding credits of $14,245, and "amount you owe" as $169,882. But she included no payment with her return.

On August 18, 2014, respondent assessed the tax shown as due, an addition to tax for failure to pay, and interest. Petitioner did not pay the liability on notice and demand. As of September 2016 her assessed liability for 2013 exceeded $207,000.

On September 5, 2016, the IRS issued petitioner a Notice CP92, Seizure of Your State Tax Refund and Your Right to a Hearing. She timely requested a CDP hearing, challenging her underlying liability and stating that she could not pay the tax. She alleged that she had never received the $1,073,312 reported on her return, asserting that "the sale proceeds were immediately wired to Virginia Commerce Bank * * * and used to pay off the Bank credit line of the law firm that I worked

**[\*5]** for." She stated that she had reported this gain in error and wished to resolve the matter at the CDP hearing.[2]

A.    Initial CDP Hearing

A settlement officer (SO) at the Appeals Office in Memphis, Tennessee, was assigned to petitioner's case. During the conference the SO told petitioner that no collection alternatives could be considered because she had supplied no financial information. The SO did not offer her additional time to supply this information and did not address her challenge to her underlying liability. Three days later the IRS issued her a notice of determination sustaining the collection action, asserting incorrectly that "[y]ou did not raise a challenge to the existence or amount of the underlying liability."

Petitioner timely petitioned for review of the IRS' action. In May 2018 respondent moved to remand the case to the Appeals Office for a supplemental CDP hearing. Respondent agreed that petitioner was entitled to challenge her underlying tax liability for 2013 and conceded that the SO "never properly considered petitioner's challenge to her underlying tax liability." We granted that motion and remanded the case.

---

[2]Petitioner also requested withdrawal of a tax lien, but the IRS had not filed a notice of Federal tax lien for 2013.

[*6] B.     Supplemental CDP Hearing

On remand the case was assigned to the same SO who had conducted petitioner's original hearing. On June 13, 2018, the SO sent petitioner a letter scheduling a telephone conference. That letter consisted of three pages of single-spaced text and closely resembled the letter scheduling the original hearing. But the June 13, 2018, letter included an additional bullet point stating: "Your 2013 tax liability was determined based on the documents you submitted and the return that was filed by you. If any figures were in error, please submit a Form 1040X Amended return by 07/03/2018 for my review."

Petitioner did not submit an amended return within three weeks as the SO had directed. The SO accordingly informed petitioner that the collection action would be sustained. The SO immediately closed the case and issued petitioner a supplemental notice of determination.

The case was returned to this Court for further proceedings. In February 2019 respondent filed a motion for summary judgment, urging that petitioner was precluded from challenging her underlying tax liability because she failed to submit an amended 2013 return by the SO's deadline. We denied that motion, concluding that the SO had acted unreasonably by failing to take the steps necessary

**[\*7]** to get to the bottom of petitioner's underlying liability challenge. <u>Dodd I</u>, 118 T.C.M. (CCH) at 188.

By order served September 19, 2019, we remanded the case to the Appeals Office for a second supplemental hearing. We directed that the SO should address petitioner's challenge to her underlying liability and (if that challenge were rejected) allow her to submit additional information relevant to consideration of a collection alternative.

C.    <u>Second Supplemental Hearing</u>

On October 30, 2019, a new settlement officer (SO2) was assigned to petitioner's case. SO2 confirmed that petitioner's tax for 2013 was properly assessed and that all other requirements of law and administrative procedure were satisfied. SO2 was assisted by an Appeals officer (AO) familiar with examination of partnership issues. The AO requested documents from petitioner, including the Cadillac partnership agreement, loan documents, and other partnership materials. These documents revealed the facts recited <u>supra</u> pp. 2-4 and the following facts.

On August 25, 2011, Cadillac borrowed $1,843,758 from Virginia Commerce Bank (VCB). Petitioner and Mr. Braude signed the loan agreement as members of Cadillac. The agreement provided that repayment of the loan would

**[*8]** be accelerated if (among other things) Cadillac sold any of the collateral securing the loan.

One or more of the properties that Cadillac sold in 2013 had served as collateral for the VCB loan, so the sale triggered the acceleration clause. At the closing, sufficient proceeds were wired to VCB to pay off Cadillac's loan, which was marked "paid and cancelled" as of June 13, 2013. Petitioner was thus relieved of liability for her share of Cadillac's debt.

Petitioner supplied the AO with a reconciliation of her adjusted basis in Cadillac at year-end 2013. Her year-end adjusted basis of $836,477 included an increase to basis of $1,073,312 (reflecting her share of the section 1231 gain) and decreases to basis of $201,601 and $611,994 (reflecting, respectively, a distribution to her and a reduction in her share of partnership liabilities).

In 2007 B&M had obtained a $1.1 million working capital line of credit (LOC) from BB&T Bank. The LOC was secured by B&M's office building, one of Cadillac's real estate assets. Petitioner signed the loan agreement as a "co-borrower or guarantor." And she signed on Cadillac's behalf the "real property recordation and transfer tax form" that memorialized BB&T's security interest in the building.

**[*9]** In 2011 the LOC was increased to $1.5 million. Petitioner signed the statement of intent, again as "co-borrower or guarantor," both personally and as Cadillac's managing member. During the supplemental CDP hearing petitioner contended that the proceeds of Cadillac's 2013 sale were used to pay off, not only Cadillac's $1,843,758 loan from VCB, but also B&M's $1.5 million LOC. But she offered no documentary evidence to substantiate the latter contention. The AO ultimately informed SO2 of her conclusion that petitioner "constructively received" the $1,073,312 gain reported on her return and "will be taxed on it."

Petitioner supplied SO2 with Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals. That form reported assets in excess of $300,000 but did not include as an asset her 33.5% membership interest in Cadillac. Upon review of petitioner's financial information SO2 concluded that she could fully pay her 2013 liability.

SO2 offered petitioner an installment agreement calling for monthly payments of $3,483. During a March 13, 2020, telephone call to discuss that offer, petitioner requested additional time to investigate whether Mr. Braude's firm would take responsibility for this liability. SO2 granted her request, but petitioner did not respond to follow-up phone calls or return an executed Form 433-D, Installment Agreement.

**[\*10]** Having heard nothing from petitioner for several months, SO2 closed the case. On July 22, 2020, the IRS issued petitioner a supplemental notice of determination sustaining the collection action. The notice rejected petitioner's underlying liability challenge, concluding that she had "constructively received the proceeds from [Cadillac's] sale of the properties" and that she was taxable on her 33.5% distributive share of the partnership's gain. Analysis of petitioner's financial information showed that she had "the ability to pay the balance in full." And because petitioner declined to execute Form 433-D, she was ineligible for a collection alternative.

The case was returned to this Court for further proceedings. On July 27, 2021, the parties moved to submit the case for decision without trial under Rule 122. We granted that motion, adopting the parties' proposed briefing schedule. Respondent timely filed his opening brief. Petitioner did not file a brief by the due date or subsequently.

## Discussion

### A.    Standard of Review

Section 6330(d)(1) does not prescribe the standard of review that this Court should apply in reviewing an IRS administrative determination in a CDP case. The general parameters for such review are marked out by our precedents. Where the

**[*11]** validity or amount of the taxpayer's underlying liability is properly at issue, we review the IRS' determination of that issue de novo. Goza v. Commissioner, 114 T.C. 176, 181-182 (2000). Where the taxpayer's underlying liability is not before us, we review the IRS' decision for abuse of discretion only. Id. at 182. Abuse of discretion exists when a determination is arbitrary, capricious, or without sound basis in fact or law. See Murphy v. Commissioner, 125 T.C. 301, 320 (2005), aff'd, 469 F.3d 27 (1st Cir. 2006).[3]

B.    Underlying Liability

A taxpayer may challenge the existence or amount of her underlying liability in a CDP proceeding only "if the person did not receive any statutory notice of deficiency for such tax liability or did not otherwise have an opportunity to dispute" it. Sec. 6330(c)(2)(B). Respondent concedes (and we agree) that petitioner was entitled to challenge at the CDP hearing her underlying liability for 2013. That liability was self-reported on her return, and she had no prior opportunity to dispute it. See ibid.; Montgomery v. Commissioner, 122 T.C. 1, 8-9 (2004).

Petitioner's underlying liability challenge is limited to the $1,073,312 gain passed through to her from Cadillac. Section 702(a) provides that, "[i]n determin-

---

[3]Because petitioner did not file a brief, we could rule against her for that reason alone. See Rule 123. We will nevertheless consider her argument on the merits.

[*12] ing his income tax, each partner shall take into account separately his distributive share" of the partnership's items of income and loss. As particularly relevant here, each partner must include his or her distributive share of the partnership's "gains and losses from sales or exchanges of property described in section 1231." Sec. 702(a)(3). Each partner's distributive share is "determined by the partnership agreement." Sec. 704(a).[4]

The documents that petitioner supplied to the AO during the second supplemental hearing confirmed that she was a partner in Cadillac and that she owned a 33.5% share of Cadillac's profit, loss, and capital. Those documents also confirmed that Cadillac in 2013 realized a net section 1231 gain of $3,203,916. Petitioner's distributive share of that gain, as correctly reported on her Schedule K-1, was $1,073,312 (0.335 × $3,203,916).

Section 702(a) explicitly provides that each partner is taxable on "his distributive share" of partnership income. It is well established that this rule applies regardless of whether the partner receives the income currently, via distribution or otherwise. See United States v. Basye, 410 U.S. 441, 454 (1973) ("[N]o matter the reason for nondistribution each partner must pay taxes on his distributive share.");

---

[4]The allocation specified in the partnership agreement does not control if the allocation lacks "substantial economic effect." Sec. 704(b)(2). Petitioner does not contend that this exception has any application here.

[*13] <u>Eaton Corp. & Subs. v. Commissioner</u>, 152 T.C. 43, 53 (2019) ("Each partner is taxed on its distributive share of partnership income without regard to whether the income is actually distributed."); <u>Dodd I</u>, 118 T.C.M. (CCH) at 188 n.3 (same).

Petitioner asserted in her petition that Cadillac's sale proceeds "went directly to Virginia Commerce Bank * * * to pay for someone else's responsibility" and that she "never received the money directly or indirectly." The AO investigated this allegation during the second supplemental hearing. The documentary evidence establishes that a portion of the proceeds was used to repay Cadillac's $1,843,758 debt to VCB. Petitioner benefited from that repayment because her share of Cadillac's liabilities was thus reduced by $611,994.

Petitioner contended that the balance of the proceeds was used to pay off B&M's line of credit. Petitioner did not submit, to the AO or the Court, any evidence that this actually happened. But assuming arguendo that it did, the AO noted that petitioner was liable as a "co-borrower or guarantor" on the LOC, both in her individual capacity and as the managing member of Cadillac. To some degree, petitioner indirectly benefited from repayment of the LOC as well.

For Federal tax purposes, however, the question is not whether petitioner benefited from these loan repayments or "constructively received" the funds. <u>Cf.</u>

[*14] sec. 1.451-2, Income Tax Regs. (addressing constructive receipt). Under section 702(a) she is taxable on her distributive share of the section 1231 gain whether or not it was distributed. (It appears that $201,601 of the gain was distributed to her.) To the extent petitioner is contending that the sales proceeds were applied incorrectly--to Mr. Braude's benefit and her detriment--she is advancing a State law argument that we lack jurisdiction to consider.

We conclude that petitioner was required to include in gross income for 2013 her $1,073,312 distributive share of Cadillac's net section 1231 gain. She does not dispute in any other respect the tax reported on her return. And she did not offer, during the CDP hearing or in this Court, any defense to the addition to tax for failure to pay (apart from contending that she had no liability for the tax). We thus reject her challenge to her underlying tax liability.

C.    Abuse of Discretion

In deciding whether the SOs abused their discretion in sustaining the collection action, we consider whether they: (1) properly verified that the requirements of applicable law or administrative procedure have been met, (2) considered any relevant issues petitioner raised, and (3) considered "whether any proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of * * * [petitioner] that any collection action be no more intrusive than

[*15] necessary." Sec. 6330(c)(3). Our review of the record establishes that the SOs properly discharged all of their responsibilities under section 6330(c).

Petitioner in her CDP hearing request checked the box "I Cannot Pay Balance" and submitted a Form 433-A during the second supplemental hearing. After analyzing petitioner's financial information, SO2 concluded that she could pay her 2013 tax liability in full, and petitioner does not contest that determination. SO2 offered her an installment agreement calling for monthly payments of $3,483, but she did not accept that offer or put an alternative proposal on the table. After hearing nothing from petitioner for several months, SO2 did not abuse her discretion in determining that petitioner was not eligible for a collection alternative. See Pough v. Commissioner, 135 T.C. 344, 351 (2010) ("[I]t is not an abuse of discretion [for an SO] to move ahead if the taxpayer fails to submit the requested items."); Bullock v. Commissioner, T.C. Memo. 2017-161, 114 T.C.M. (CCH) 216, 218 ("[A]n SO is not required to negotiate with a taxpayer indefinitely.").

Finding no abuse of discretion in any respect, we will sustain the collection action. We note that petitioner is free to submit to the IRS at any time, for its consideration and possible acceptance, a collection alternative in the form of an offer-in-compromise or an installment agreement, supported by the necessary financial information.

[*16] To reflect the foregoing,

Decision will be entered for

respondent.
